**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CURTIS HURST,**<br>**Plaintiff,** | : | |
| **v.** | : | **CIVIL ACTION NO. 26-CV-6640** |
| **REGINALD BROWNE,**<br>***et al.*,**<br>**Defendants.** | : | |

**MEMORANDUM**

**MURPHY, J.** **NOVEMBER 10, 2026**

Plaintiff Curtis Hurst filed this *pro se* civil action alleging his constitutional rights were violated in connection with his eviction from a rental property, located at 59 E. High Street, Apartment I, in Philadelphia (the "property"), and the related state court proceedings. He also brings claims under state law. He names the following Defendants: Reginald Browne and his companies, Fat Tail Real Property III, LP, Fat Tail Holdings III, LLC, and Fat Tail Holdings, LLC (collectively, the "Fat Tail Defendants"), LYL Realty Group, LLC ("LYL"), Kenneth L. Baritz, Baritz KBK Law Group, LLC, the City of Philadelphia (the "City"), the Philadelphia Sheriff's Office, Doe Law Enforcement Officers 1-3, the First Judicial District of Pennsylvania, and Philadelphia Municipal Court employees, Danielle Jackson, Doe Supervisor #1, and Doe Clerk #2. For the following reasons, the Court will dismiss the Complaint.

## I. FACTUAL ALLEGATIONS[1]

[1] Hurst's Complaint ("Compl.") consists of approximately forty-two typewritten pages. (ECF No. 2.) The factual allegations set forth in this Memorandum are taken from the Complaint, and the Court adopts the sequential pagination assigned by the CM/ECF docketing system. The Court may also take judicial notice of prior court proceedings and consider matters of public record when conducting a screening under § 1915. *See, e.g., In re Ellerbe*, No. 21-3003, 2022 WL 444261, at *1 (3d Cir. Feb. 14, 2022) (*per curiam*) (citing *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 416 n.3 (3d Cir. 1988) (holding that court may

Hurst resided at the property "from November 2022 until his exclusion on July 29, 2026." (Compl. at 3.) He signed the lease on November 4, 2022, which listed Defendant Browne's company, "Fat Tail Holdings," as the landlord to whom the rent was payable. (*Id.* at 5.) Hurst has severe obstructive sleep apnea, hypertension, and "documented physical, neurological, cognitive, respiratory, and chronic immune impairments that substantially limit major life activities," including sleeping, breathing, and neurological, cognitive, and executive functioning. (*Id.* at 3.) He asserts Browne, the Fat Tail Defendants, and the property manager, Defendant LYL, "had knowledge of [his] medical vulnerability from the inception of the tenancy, having accepted rental assistance provided on [his] behalf through a public health program in October 2022." (*Id.* at 28.) He claims Browne and LYL did not resolve many complaints made throughout his tenancy related to air filtration and mold in the property that affected his disabilities, and his issues related to security and fire-safety. (*Id.* at 17-18.) He also claims the property was not compliant with the City's ordinances in several respects, such as the property's

---

take judicial notice of the record from previous court proceedings); *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

Hurst also included allegations of fact and exhibits in numerous pleadings outside his Complaint spanning over three hundred pages. (*See* ECF Nos. 3, 9, 10, 11.) The Federal Rules of Civil Procedure do not contemplate piecemeal pleadings or the amalgamation of pleadings, even in the context of a *pro se* litigant. *See Bryant v. Raddad*, No. 21-1116, 2021 WL 2577061, at *2 (E.D. Pa. June 22, 2021) ("Allowing a plaintiff to file partial amendments or fragmented supplements to the operative pleading, 'presents an undue risk of piecemeal litigation that precludes orderly resolution of cognizable claims.'" (quotation omitted)). However, where noted, additional factual information may be cited from other *pro se* pleadings filed by Hurst, so that the true nature of his claims may be understood. When conducting a screening under § 1915(e)(2)(B)(ii), as with a motion under Fed. R. Civ. P. 12(b)(6), "a court may look to 'allegations contained in the other court filings of a pro se plaintiff' to clarify statements made in the complaint." *Helms v. Sorber*, No. 24-6928, 2026 WL 358286, at *5 n.4 (E.D. Pa. Feb. 9, 2026) (quoting *Swofford v. Mandrell*, 969 F.2d 547, 549 (7th Cir. 1992)); *see also Maio v. Aetna, Inc.*, 221 F.3d 472, 485 n.12 (3d Cir. 2000) ("[W]hile this case involves a motion to dismiss under Rule 12(b)(6), the Supreme Court. . . confirmed that we may use appellants' brief 'to clarify allegations in the complaint whose meaning is unclear.'" (quoting *Pegram v. Herdrich*, 530 U.S. 211, 230 n.10 (2000))).

rental license was not issued until March 6, 2024, subsequently lapsing throughout his tenancy, failed inspections, and did not have a valid lead certification as required. (*Id.* at 6-8, 17.)

Hurst continues to provide background of the ongoing issues between himself, Browne, and the other Defendants and attacks the state court proceedings in a manner that is hard to follow. (*Id.* at 6-21.) The Court will summarize the events and his complaints to the best it can discern. Ultimately, Hurst explains, "the underlying matter is a nonpayment matter." (*Id.* at 10.) He claims that since August 2025, he "has lived under a continuous, unresolved threat of dispossession" that "bears with particular severity on a person with [his] impairments." (*Id.* at 19.) It appears the issues related to nonpayment of rent began when Browne issued a letter on March 7, 2024, on Fat Tail Holdings letterhead demanding $9,094 in rent arrears and costs even though the property had no valid rental license until the day prior. (*Id.* at 7.) The nonpayment of rent led to a state court eviction action,[2] and on September 4, 2024, a judgment by agreement was entered in the amount of $11,371.75. (*Id.* at 10.) Hurst claims he has paid substantially more than the agreement in the amount of $22,154.22, including $5,500 on August 27, 2025. (*Id.*) Prior to August 27, 2025, he attempted to make a $5,500 online payment, presumably for rent arrears, but the amount was too much for the online portal. (*Id.*) He attempted to make the payment to Defendant Baritz and/or Baritz's Law Firm, whom he identifies as debt collectors, but was told his payment would not be accepted. (*Id.* at 10, 18-19.) Hurst subsequently contacted Browne to attempt to make the payment, but Browne said, "he had a court order and intended to proceed with the eviction regardless." (*Id.* at 10.) Hurst then tried to pay the rent

[2] A review of the public record reveals the underlying state court proceedings were initiated by Fat Tail Real Property III, L.P. on May 30, 2024. *Fat Tail Real Property III, L.P. v. Hurst*, No. LT-24-05-30-6402 (M.C. Phila); *see also* https://fjdclaims.phila.gov/phmuni/casedocket/caseDocket.do?caseID=3272717 (last accessed: Nov. 6, 2026).

arrears to "the officers executing the lockout, but they said he "should have gone to court that morning" and proceeded with the lockout. (*Id.*) Hurst "sought relief in the Court of Common Pleas, which stayed enforcement on or about August 28, 2025, and restored [him] to possession on or about September 2, 2025." (*Id.* at 11.) Following entry of that order, although he was ultimately able to enter the property through other means, Defendants did not provide him with electronic access to the building or a key to the lower lock on his door. (*Id.*) He received partial access to the electronic system on November 10, 2025, but his authorization to the system was disabled again on March 25, 2026. (*Id.*) He went to the Philadelphia Sheriff's Office and "personally presented the order restoring him to possession," but the "personnel" told him "that the order did not tell them what to do, and that [he] would have to return to the judge to obtain clarification." (*Id.* at 11-12.) He challenges the state court's order restoring possession, claiming it was "insufficiently clear to direct the conduct of the office charged with enforcing possession." (*Id.* at 12.)

Turning to Hurst's claims related to being denied access to the courts, he alleges that on July 28, 2026, he "arrived at the Municipal Court Judgments and Petitions Unit at approximately 3:50 P.M. to tender two separate documents, assembled separately and presented in separate folders: an Emergency Petition and a Motion to Strike or Open and Vacate Judgment by Agreement. A lockout was scheduled for the following morning." (*Id.* at 13.) He informed court staff "that the filings were emergency filings intended to prevent an imminent lockout, and that he has a documented cognitive disability." (*Id.*) As to his first document, the motion to strike and vacate the judgment by agreement, presumably the agreement made between Hurst and the Fat Tail Defendants in 2024, Defendant Jackson claimed that the judge reviewed the document and would not accept the filing because over two years had passed. (*Id.*) He

requested written confirmation of the refusal, but was told there was "nothing to write." (*Id*. at 14.) "Upon information a belief," Hurst avers no judge reviewed the filing. (*Id*. at 13.) As to his second document for the emergency petition, court staff, including Jackson, gave him *in forma pauperis* paperwork to complete rather than filing the document. (*Id.*) Because of his disability, he spent a substantial amount of time filling out the paperwork until after 5:00 p.m. when the courthouse closed. (*Id*. at 13-14.) Since the paperwork was not completed until after the Clerk's Office closed, he was instructed to return in the morning to file his emergency petition. (*Id*. at 14.) He arrived the next morning and while he was at the courthouse, the "lockout was executed at approximately 10:00 A.M. on July 29, 2026." (*Id.*) His emergency petition was ultimately docketed, and a hearing was set for August 5, 2026. (*Id*. at 16.) When communicating with Browne after the lockout, he told Hurst on July 31, 2026, "Amazing how you fight to live for free" and "Any attempt to re-enter the property, and the police will be called." (*Id.*) An amended order was subsequently entered in the underlying state matter on August 4, 2026, permitting his re-entry to the property pending the August 5th hearing. (*Id.*) When Hurst contacted Browne to allow him into the property, Browne responded in writing, "No—we will see you in court tomorrow. We will call the police if you enter. You are not allowed on my property." (*Id.*) As a result, he had to appear at the August 5th hearing without his legal files and medication. (*Id.*) At the hearing, he claims he was denied the opportunity to speak while opposing counsel was heard, his accommodation was returned to him unread as "too long,"[3] and his continuance request and exhibits were not addressed. (*Id.*) He alleges the

[3] It appears the accommodation Hurst is referring to is a four-page email sent to the Clerk's Office on July 29, 2026, regarding the motions he attempted to file. (ECF No. 3 at 64-67.) He demanded, *inter alia*, a written response to several of his questions from the judge who reviewed his filings, preservation of written records, surveillance videos, and other "evidence" of his interaction with the court staff, and for his filings to be deemed timely. (*Id.*)

"record as it presently stands reflects an eviction proceeding and executed lockouts." (*Id.* at 22.) At some point shortly after the hearing resulting in eviction, Browne imposed a daily storage fee while his possessions remained at the property and told him that after thirty days, his possessions would be disposed of. (*Id.* at 16.)

Consistent with Hurst's allegations, a review of the public record in the underlying state matter reveals a judgment by agreement for possession was entered by the parties on September 4, 2024, in the event Hurst paid $11,250 plus costs. *Hurst*, No. LT-24-05-30-6402. A Writ of Possession was subsequently filed on February 28, 2025, which was served by the Sheriff's Office on March 6, 2025. *Id.* An Affidavit by Breach of Agreement was also filed by Fat Tail clarifying that Hurst did not make the payments agreed to in November, January and February. *Id.* Also consistent with his allegations, Hurst's eviction from the property was scheduled in August 2025, but the Court ultimately granted his motion to restore possession to the property in September 2025. (*Id.*) In December 2025, another Writ of Possession was filed. *Id.* Hurst requested the Court to stay the eviction, but his request was denied on June 3, 2026, and the Court ordered that no lockout shall be scheduled before July 20, 2026. *Id.* The public record reflects that on July 29, 2026, Hurst filed his Emergency Petition to Stay Writ of Execution Pending Adjudication of Accompanying Motion to Vacate. *Id.* The following day, it appears the Court denied his petition, noting that Hurst filed "an emergency appeal of the denial to the Court of Common Pleas," and "[i]n that matter, the Court ordered the petitioner to vacate the premises by July 20, 2026." *Id.* The record further reflects the Court of Common Pleas temporarily stayed the eviction and lockout pending the appeal and permitted Hurst to re-enter the property on August 4, 2026, before the hearing was scheduled the following day. *Id.*; *see also Fat Tail*

*Real Property III, L.P. v. Hurst*, No. 26080065 (C.P. Phila.). The docket also reflects the Order entered by the Court of Common Pleas on August 5, 2026, denying Hurst's appeal of the Municipal Court's denial of his emergency motion to restore possession. *Id.*

Hurst attacks the underlying state court action throughout his Complaint, claiming several defects in the orders and procedures, such as granting motions ex parte and improper docketing. (*See, e.g.,* Compl. at 10-16.) His primary contention appears to be related to his belief that the writ of possession orders were not actually valid, but law enforcement executed the lockouts regardless and failed to prepare file an inventory and service return. (*Id.* at 15-16.) He also claims that the record does not show he paid and tendered amounts exceeding the judgments, and only reflects an eviction proceeding and the lockouts, which impairs his ability to obtain future housing. (*Id.*) He takes issue that the state court case "was filed in the name of Fat Tail Real Property III, L.P., a Pennsylvania limited partnership whose general partner is Fat Tail Holdings III, LLC – a different entity from the 'Fat Tail Holdings' identified on [his] lease."[4] (*Id.* at 5-6.) He claims the lease filed in state court is different than the lease he actually signed and reflects a different landlord designation. (*Id.* at 5.) He also asserts issues related to his signatures on court filings (*id.* at 15), and to the address that the Court of Common Pleas used to send him orders, which identified the apartment as "1" instead of "I" (*id.* at 10). He avers that after being restored possession of the property, a "pattern" of not honoring the orders prevented him from actually regaining possession. (*Id.* at 12-13.) He sent a notice to the City's legal department about this issue, including other deficiencies like the ordinance violations at the property and Browne and the Fat Tail Defendants' unwillingness to accept payments for his rent arrears, but the City did

[4] Hurst attached a copy of his lease to one of his emergency motions identifying "Fat Tail Holdings III" as the landlord. (ECF No. 9 at 128.)

not take any action to investigate his complaints. (*Id*. at 15.)

As a result of these events, Hurst is unhoused, without his essential items, like his medications and health devices, and "has "experienced sleep disruption, anxiety, difficult concentrating, and deterioration in his ability to manage his medical care and daily functioning."[5] (*Id*. at 20-21.) Hurst brings claims under the First, Fourth, and Fourteenth Amendments, and for violations of the Americans with Disabilities Act ("ADA"), the Fair Housing Act ("FHA"), and the Fair Debt Collection Practices Act ("FDCPA"). (*Id*. at 22-30.) He also alleges a municipal liability claim against the City and brings several state law claims. (*Id*. at 31-39.) As relief, he seeks money damages, and declaratory[6] and injunctive relief restoring his possession of the property.[7] (*Id*. at 39-40.)

---

[5] Hurst also alleges he is deprived of necessary paperwork and legal paperwork he needs to pursue his government assistance benefits, appointments, and appeal his job termination, which occurred on August 27, 2026. (Compl. at 20-21.)

[6] Declaratory relief is unavailable to adjudicate past conduct, so his request for this type of relief is dismissed. *See Corliss v. O'Brien*, 200 F. App'x 80, 84 (3d Cir. 2006) (*per curiam*) ("Declaratory judgment is inappropriate solely to adjudicate past conduct" and is also not "meant simply to proclaim that one party is liable to another."); *see also Andela v. Admin. Office of U.S. Courts*, 569 F. App'x 80, 83 (3d Cir. 2014) (*per curiam*) ("Declaratory judgments are meant to define the legal rights and obligations of the parties in the anticipation of some future conduct."). A declaratory judgment is also not "meant simply to proclaim that one party is liable to another." *Corliss*, 200 F. App'x at 84 (*per curiam*); *see also Taggart v. Saltz*, No. 20-3574, 2021 WL 1191628, at *2 (3d Cir. Mar. 30, 2021) (*per curiam*) ("A declaratory judgment is available to define the legal rights of the parties, not to adjudicate past conduct where there is no threat of continuing harm.").

[7] Shortly after he filed his Complaint, Hurst filed a motion for a temporary restraining order requesting, *inter alia*, that Defendants be enjoined from executing the state court-ordered eviction from the property (ECF No. 3), which the Court denied. (ECF No. 8.) He renewed his motion (ECF No. 9), and the Court explained in denying his motion that the relief he seeks is likely barred by the Anti-Injunction Act and his success on the merits is unlikely. (ECF No. 12 at 1-2.) Although he claims he is not seeking a review or reversal of the state court judgment (Compl. at 2), the injunctive relief he seeks for his access and possession of the property to be restored would require just that. (*Id*. at 39-40.) This type of relief is also not proper since the Anti-Injunction Act, 28 U.S.C. § 2283, "prohibits injunctions having the effect of staying proceedings in state courts except 'as expressly authorized by Act of Congress, or where

## II. STANDARD OF REVIEW

Because Hurst is proceeding *in forma pauperis*,[8] 28 U.S.C. § 1915(e)(2)(B)(ii) requires the Court to dismiss the Complaint if it fails to state a claim. Whether a complaint fails to state a claim under § 1915(e)(2)(B)(ii) is governed by the same standard applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), *see Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999), which requires the Court to determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At this early stage of the litigation, the Court will accept the facts alleged in the *pro se* complaint as true, draw all reasonable inferences in the plaintiff's favor, and ask only whether the complaint contains facts sufficient to state a plausible claim. *See Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021), *abrogation on other*

---

necessary in aid of its jurisdiction, or to protect or effectuate its judgments.'" *In re Prudential Ins. Co. of Am. Sales Practices Litig*., 314 F.3d 99, 103 (3d Cir. 2002) (quoting 28 U.S.C. § 2283). "The Act 'is an absolute prohibition against enjoining state court proceedings, unless the injunction falls within one of [the] three specifically defined exceptions'" — namely, (1) authorization by Congress, (2) necessary for aid of jurisdiction, or (3) to protect a judgment — which are to be construed narrowly. *Id.* (quoting *Atl. Coast Line R.R. Co. v. Brotherhood of Locomotive Eng'rs*, 398 U.S. 281, 286 (1970)).

Courts in the Third Circuit have consistently held that "[t]he Anti-Injunction Act precludes a federal court from enjoining state court eviction or foreclosure proceedings." *McMillan v. Nationstar Mortg. Co*., No. 20-1321, 2020 WL 4201605, at *2 (E.D. Pa. July 22, 2020) (citing cases); *see also, e.g., Frankel v. Kessler*, No. 21-0093, 2021 WL 229321, at *5 (E.D. Pa. Jan. 22, 2021) (dismissing complaint on screening and denying temporary restraining order where claims related to state court eviction proceeding were barred by the Anti-Injunction Act); *Frankel v. Guzman*, No. 20-5208, 2020 WL 6161512, at *2 (E.D. Pa. Oct. 21, 2020) (rejecting emergency request to enjoin eviction proceedings and noting weight of authority in the Third Circuit to support holding); *Rhett v. Div. of Hous., Dep't of Cmty. Affairs*, No. 14-5055, 2014 WL 7051787, at *3 (D.N.J. Dec. 12, 2014) ("[T]o the extent Plaintiff requests that this Court dismiss the eviction proceedings or order them transferred to this Court, the Anti–Injunction Act prohibits this Court from taking such action."). Accordingly, the Court cannot enjoin the state court eviction proceedings, the execution of a state court eviction order, or restore his access to the property, and Hurst's request for that relief is dismissed.

[8] The Court previously granted his request for leave to proceed *in forma pauperis*. (ECF No. 12.)

*grounds recognized by Fisher v. Hollingsworth*, 115 F.4th 197 (3d Cir. 2024). Conclusory allegations do not suffice. *Iqbal*, 556 U.S. at 678. As Hurst is proceeding *pro se*, the Court construes his allegations liberally. *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (citing *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244-45 (3d Cir. 2013)).

Furthermore, the Court must dismiss the Complaint if it lacks subject matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3); *see also Grp. Against Smog & Pollution, Inc. v. Shenango, Inc.*, 810 F.3d 116, 122 n.6 (3d Cir. 2016) (explaining that "an objection to subject matter jurisdiction may be raised at any time [and] a court may raise jurisdictional issues *sua sponte*"). A plaintiff commencing an action in federal court bears the burden of establishing federal jurisdiction. *See Lincoln Benefit Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015) ("The burden of establishing federal jurisdiction rests with the party asserting its existence." (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006))). "Jurisdictional [issues] . . . may be raised at any time and courts have a duty to consider them *sua sponte*." *Wilkins v. United States*, 598 U.S. 152, 157 (2023) (internal quotations omitted).

## III. DISCUSSION

Hurst asserts federal constitutional claims pursuant to 42 U.S.C. § 1983, the vehicle by which such claims may be brought against state actors in federal court, and related state law claims. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). In a § 1983 action, the personal involvement of each defendant in the alleged constitutional violation is a required element, and, therefore, a plaintiff must allege how each defendant was

involved in the events and occurrences giving rise to the claims. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

**A. Claims Against the Philadelphia Sheriff's Office**

Although municipalities and other local government units are deemed "persons" subject to liability under § 1983, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), sheriff's departments cannot be sued in conjunction with a county because they are merely arms of the county, not separate entities. *See Dobson v. Owens*, No. 89-2163, 1989 WL 37140, at *1 (E.D. Pa. Apr. 13, 1989) (holding that Philadelphia Sheriff's Department is not a person for § 1983 purposes); *see also Bonenberger v. Plymouth Township*, 132 F.3d 20, 25 n.4 (3d Cir. 1997) (for purposes of § 1983 claims, municipalities and police departments are treated as a single entity). The Philadelphia Sheriff's Department is an agency of the City. *See* 53 Pa. Stat. Ann. § 13132(c) ("Subject to the provisions of the Philadelphia Home Rule Charter and the First Class City Home Rule Act . . . , the Council of the City of Philadelphia shall have full powers to legislate with respect to the election, appointment, compensation, organization, abolition, merger, consolidation, powers, functions and duties of the Sheriff . . . ."). Because Hurst has named the City as a Defendant, the Sheriff's Department, a branch of the City, cannot be sued as an individual entity. Accordingly, the claims against the Sheriff's Department are dismissed with prejudice.

**B. Claims against Doe Law Enforcement Officers #1-3**

Hurst brings Fourteenth Amendment due process claims and Fourth Amendment unlawful seizure claims against the law enforcement officers, identified as Doe Defendants, involved in executing his eviction from the property resulting in the deprivation of his personal possessions. (Compl. at 25-27.) The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

seizures." U.S. Const. amend. IV. Under the Fourteenth Amendment, Hurst is entitled to due process of law before the government can deprive him of his "life, liberty, or property." U.S. Const. amend. XIV, § 1, cl. 3. Nonetheless, an individual may not assert a claim under § 1983 for even an intentional deprivation of the individual's property by a government employee "if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *see also Daniels v. Williams*, 474 U.S. 327, 328 (1986) (negligent acts of officials causing unintentional loss of property do not violate due process). Pennsylvania law provides Hurst with an adequate state remedy— the Pennsylvania Tort Claims Act— for the deprivation of his personal property. *See Spencer v. Bush*, 543 F. App'x 209, 213 (3d Cir. 2013) (*per curiam*); *see also, e.g., Shakur v. Coelho*, 421 F. App'x 132, 135 (3d Cir. 2011) (*per curiam*) (explaining that the Pennsylvania Tort Claims Act provides an adequate remedy for a willful deprivation of property); *Thompson v. Ferguson*, No. 19-3455, 2019 WL 3573525, at *5 (E.D. Pa. Aug. 5, 2019) (dismissing Fourteenth Amendment claim based on the loss and destruction of property during a search because the Pennsylvania Tort Claims Act provides an adequate remedy).

In addition to a deprivation of property claim, Hurst alleges that on July 29, 2026, the law enforcement officers executed the eviction without valid legal authority violating his due process rights and resulting in an unlawful seizure of the property under the Fourth Amendment. (Compl. at 25-26.) However, he alleges that on July 28, 2026, he arrived at the Municipal Court to file his pleadings because "[a] lockout was scheduled for the following morning." (Compl. at 13.) He informed court staff "that the filings were emergency filings intended to prevent an imminent lockout." (*Id.*) Since the paperwork was not completed until after the Clerk's Office closed, he was instructed to return in the morning to file his emergency petition. (*Id.* at 14.) He

arrived the next morning and while he was at the courthouse, the "lockout was executed at approximately 10:00 A.M. on July 29, 2026." (*Id.*) Because it is apparent from Hurst's own allegations, in addition to the public record, that the lockout was scheduled in the underlying state court matter, hence his request to restore possession filed that same day, the police officers who carried out and assisted with the writ of eviction are entitled to quasi-judicial immunity on his civil rights claims since they were acting pursuant to the state court order. *See, e.g., Barel v. Off. of Clerk of Superior Ct. of N.J.*, 834 F. App'x 763, 765 (3d Cir. 2020) (*per curiam*) (holding that a sheriff executing a court order enjoys quasi-judicial immunity) (citing *Russell v. Richardson*, 905 F.3d 239, 250 (3d Cir. 2018) (quasi-judicial immunity covers acts authorized by court order); *Roland v. Phillips*, 19 F.3d 552, 556 (11th Cir. 1994) (quasi-judicial immunity protects law enforcement officials executing facially valid court orders)). Furthermore, even if the order was unlawful, the police officers involved are entitled to rely on the facially valid state court order. In any event, even if his injuries were caused by a defect in the state court judgment—*e.g.,* a lack of due process—and he is seeking to invalidate the state court's decision on that basis, the *Rooker-Feldman* doctrine bars his claims. *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *District of Columbia Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983). Pursuant to the *Rooker-Feldman* doctrine, "federal district courts lack jurisdiction over suits that are essentially appeals from state-court judgments." *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 165 (3d Cir. 2010). Based on that principle, as the Supreme Court recently reiterated, the *Rooker-Feldman* doctrine deprives a federal district court of jurisdiction over "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *T. M. v. Univ. of Md. Med. Sys. Corp.*, 608 U.S.

668, 672 (2026) (quoting *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 284 (2005)); *see also Great W. Mining*, 615 F.3d at 166 (same).

Since a portion of Hurst's Complaint can be understood to challenge the state court's judgments related to his eviction from the property and to request invalidation of those judgments to restore his access to the property, the Court lacks jurisdiction under the *Rooker-Feldman* doctrine over this aspect of his case. *See generally Stern v. Nix,* 840 F.2d 208, 212 (3d Cir. 1988) (explaining that the complaint in question was merely a "skillful attempt to mask the true purpose of the action, which essentially is to reverse the judicial decision [of the state court]"). Accordingly, the claims against the Doe Officers must be dismissed.

**C. Claims Against Defendants Jackson, Doe Supervisor #1, and Doe Clerk #2**

Hurst brings due process and denial of access to courts claims against Defendants Jackson, Doe Supervisor #1, and Doe Clerk #2, employees of the Philadelphia Municipal Court, based on the allegations that they would not file his documents and denied his access to courts on July 28, 2026. (Compl. at 22-24.) Specifically, he asserts Jackson told him the judge reviewed his motion to strike and vacate and would not accept the filing because over two years had passed. (*Id*. at 13.) "Upon information a belief," Hurst avers no judge reviewed the filing. (*Id.*) He also claims when he tried to file an emergency petition to prevent the lockout scheduled the next day, court staff, including Jackson, gave him *in forma pauperis* paperwork to complete rather than filing the document. (*Id.*) Because he was unable to complete the paperwork before the Clerk's Office closed, he was instructed to return in the morning to file his emergency petition. (*Id*. at 14.) He arrived the next morning, and while he was at the courthouse, the "lockout was executed at approximately 10:00 A.M. on July 29, 2026." (*Id.*) He claims he was deprived of his opportunity to be heard. (*Id*. at 22-23.) His emergency petition was ultimately docketed, and a hearing was set for August 5, 2026. (*Id*. at 16.)

As an initial matter, courts have held that clerks of court and clerk's office employees enjoy absolute immunity and quasi-judicial immunity when performing duties required by statute or at the direction of judicial authority. The actions alleged, Jackson's reliance on the judge's decision[9] to not file his motion to vacate,[10] staff giving him necessary paperwork to fill out, and not accepting paperwork after the courthouse closed, are covered by immunity. *See, e.g., Elkabany v. Shapiro*, No. 25-3510, 2026 WL 1746956, at *2 (3d Cir. June 17, 2026) (*per curiam*) (affirming dismissal of claims against the "Salem County Court Staff" and other "unnamed" court personnel involved in plaintiff's divorce proceedings as barred by quasi-judicial immunity (citing *Gallas v. Supreme Ct. of Pa.*, 211 F.3d 760, 772-73 (3d Cir. 2000)); *Nemeth v. Off. of Clerk of Superior Ct. of New Jersey*, 837 F. App'x 924, 928 (3d Cir. 2020) (*per curiam*) (affirming dismissal of claims against Clerk of the Superior Court who signed facially valid writs of execution and possession related to the foreclosure of property because the clerk was entitled to absolute quasi-judicial immunity for her actions taken in her capacity as the Clerk of the Superior Court); *Dongon v. Banar*, 363 F. App'x 153, 156 (3d Cir. 2010) (*per curiam*) ("[A]ctions taken by those charged with the responsibility of carrying out a court's order would be barred by the doctrine of absolute quasi-judicial immunity."); *Harris v. Cashman*, No. 20-528, 2021 WL 602679, at *5 (W.D. Pa. Feb. 16, 2021) ("The doctrine of absolute quasi-judicial immunity has been applied to court support personnel due to the danger that disappointed

---

[9] To the extent Hurst intended to name any judges involved with the decisions made in the state court proceedings, they would be entitled to absolute immunity from civil rights claims that are based on acts or omissions taken in their judicial capacity, so long as they do not act in the complete absence of all jurisdiction. *See, e.g., Stump v. Sparkman*, 435 U.S. 349, 355-56 (1978); *Harvey v. Loftus*, 505 F. App'x 87, 90 (3d Cir. 2012) (*per curiam*); *Azubuko v. Royal*, 443 F.3d 302, 303-04 (3d Cir. 2006) (*per curiam*).

[10] Based on the public record, his motion to vacate was filed the next day on July 29, 2026, as an "Emergency Petition to Stay Writ of Execution Pending Adjudication of Accompanying Motion to Vacate." *Hurst*, No. LT-24-05-30-6402.

litigants, blocked by the doctrine of absolute immunity from suing the judge directly, will vent their wrath on clerks, court reporters, and other judicial adjuncts." (quoting *Stout v. Naus*, No. 09-0380, 2009 WL 1794989, at *3 (M.D. Pa. June 23, 2009))). Actions related to maintaining the docket are also covered by the quasi-judicial immunity afforded to court employees. *See Jarvis v. D'Andrea*, No. 14-1492, 2014 WL 4251605, at *9 (M.D. Pa. Aug. 27, 2014), *aff'd,* 599 F. App'x 35 (3d Cir. 2015) (*per curiam*) (holding that immunity applied to claims related to "the Court's power to control its docket"); *see also, e.g.*, *Boswell v. Yorgey-Girdy,* No. 26-2903, 2026 WL 2032247, at *3 (E.D. Pa. July 13, 2026) (finding allegations against Philadelphia Municipal Court clerks for a failure to maintain consistent and reliable docket procedures in an eviction action barred by quasi-judicial immunity); *Bombadil v. Laden*, No. 20-5737, 2021 WL 181434, at *5 (E.D. Pa. Jan. 19, 2021) (dismissing as barred by quasi-judicial immunity a plaintiff's claim against court administrative staff for refusing to docket filings consistent with an injunction order). Accordingly, all claims against Jackson, Doe Supervisor #1, and Doe Clerk #2 are barred by immunity and must also be dismissed.

Moreover, even if Hurst was able to overcome the quasi-judicial immunity bar, he nevertheless fails to assert plausible Fourteenth Amendment claims. "To state a claim under § 1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty, or property, and (2) the procedures available to him did not provide due process of law." *King v. City of Philadelphia*, 654 F. App'x 107, 111 (3d Cir. 2016) (*per curiam*) (quoting *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006)). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citation modified);

*see also Kadakia v. Rutgers*, 633 F. App'x 83, 88 (3d Cir. 2015) ("The essence of a procedural due process claim, of course, is notice and an opportunity to be heard."). Hurst claims he was denied a reasonable opportunity to be heard in a meaningful manner because his filings were not docketed. He states that, as a result, he "lost the opportunity to obtain a ruling that could have prevented the lockout." (Compl. at 24.) However, according to the public record and his own allegations, his emergency petition to restore possession was docketed the following day, set for a hearing, and denied on August 5, 2026. (*Id.* at 16-17; *see also Hurst*, No. LT-24-05-30-6402.) Thus, he had the opportunity to be heard on his motion in a timely manner, making his allegations insufficient to state a due process claim.[11]

**D. ADA Claim Against Defendant First Judicial District of Pennsylvania**

Hurst next brings a Title II ADA claim against the First Judicial District of Pennsylvania. (Compl. at 27-28.) Title II provides a cause of action for disabled individuals claiming that they were denied access to state courts because of their disabilities. *See Tennessee v. Lane*, 541 U.S. 509, 533-34 (2004) (recognizing that Title II of the ADA validly abrogates state sovereign immunity "as it applies to the class of cases implicating the fundamental right of access to the courts"). The proper defendant under a Title II claim is the public entity. *See* 42 U.S.C. §§ 12131(1), 12132; *see also Emerson v. Thiel Coll.*, 296 F.3d 184, 189 (3d Cir. 2002). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs,

---

[11] Hurst also claims denial of access to courts due to his emergency motions not being accepted or docketed. (Compl. at 23-24.) These allegations appear duplicative of his Fourteenth Amendment due process claims and they will also be dismissed. Hurst does not allege how he was denied access to his eviction proceedings. Rather, as explained, his allegations and the public docket demonstrate that he had extensive involvement in the underlying eviction proceedings, his emergency motions at issue were docketed on July 29, 2026, set for a hearing, and denied on August 5, 2026, after a hearing commenced. *Hurst*, No. LT-24-05-30-6402.

or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. This provision provides a cause of action for disabled individuals who claim that they were denied access to state courts because of their disabilities. *Lane*, 541 U.S. at 533-34 (recognizing that Title II of the ADA validly abrogates state sovereign immunity).

To state a plausible claim under Title II of the ADA, a plaintiff must allege that "(1) he is a qualified individual; (2) with a disability;[[12]] (3) who was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability." *Geness v. Cox*, 902 F.3d 344, 361 (3d Cir. 2018) (citations omitted). The element of discrimination by reason of disability can be met if a defendant failed to provide the plaintiff with reasonable accommodations for a disability. *See Montanez v. Price*, 154 F.4th 127, 148 (3d Cir. 2025) (citing *Haberle v. Troxell*, 885 F.3d 170, 179-80 (3d. Cir. 2018)). When determining whether an accommodation is reasonable, courts consider "whether it alters the essential nature of the program or imposes an undue burden or hardship in light of the overall program." *Doe 1 v. Perkiomen Valley Sch. Dist.*, 585 F. Supp. 3d 668, 694-95 (E.D. Pa. 2022) (quoting *Helen L. v. DiDario*, 46 F.3d 325, 337 (3d Cir. 1995)). "A public entity need not make 'fundamental' or 'substantial' alterations to accommodate a disabled individual." *Id.* at 695 (citing *Alexander v. Choate*, 469 U.S. 287, 300 (1985)).

[12] To allege plausibly that he is a "qualified individual with a disability," Hurst must provide facts to show that he has a "disability," which is defined as "a physical or mental impairment that substantially limits one or more major life activities of such individual . . ." 42 U.S.C. § 12102(1)(A). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A).

In support of his claims, Hurst claims he submitted a written request for accommodation prior to the August 5th hearing, that he was denied the opportunity to speak while opposing counsel was heard, that his accommodation was returned to him unread as "too long" and that his continuance request and exhibits were not addressed. (Compl. at 16, 27.) Hurst attached to his pleadings a four-page email sent to the Clerk's Office on July 29, 2026, with several requests related to his motions he requested to file on July 28, 2026. (ECF No. 3 at 64-67.) He also takes issue with the court staff giving him *in forma pauperis* paperwork to complete rather than filing his motions given his cognitive disabilities, which took place at the Philadelphia Municipal Court. (Compl. at 13.)

There are several issues with Hurst's claims. Hurst complains about how the Court conducted his hearing, including that his extension request and exhibits were not addressed. Such a claim is not plausible. "Title II does not require States to employ any and all means to make judicial services accessible or to compromise essential eligibility criteria for public programs." *Lane*, 541 U.S. at 511-12. Rather, "[i]t requires only 'reasonable modifications' that would not fundamentally alter the nature of the service provided" and that "afford[s] to all individuals a meaningful opportunity to be heard in [the states'] courts." *Id.* "Requiring courts to grant motions or permit meritless civil cases to proceed is not a *reasonable* accommodation under the ADA." *Alvarez v. Pennsylvania*, No. 25-4941, 2026 WL 499936, at *3 (E.D. Pa. Feb. 23, 2026) (citation omitted); *see also Henderson v. Morris*, No. 23-0346, 2025 WL 3248722, at *8 (E.D. Tex. Nov. 20, 2025) (denying plaintiff's request to grant her motion for leave to file an amended complaint as an ADA accommodation because "[t]he ADA does not require the court to grant or deny a motion or take any judicial action" (citation omitted)). More importantly, Hurst does not make any mention of why his complaints about the hearing would be required *as*

*an accommodation for a disability*.

Hurst also claims the requests he sent to the Court were returned and unread as "too long." (Compl. at 16, 27.) The only communication included in his pleadings regarding his "requests" to the Court was the referenced four-page email sent to the Clerk's Office on July 29, 2026. (ECF No. 3 at 64-67.) He demanded, *inter alia*, a written response to several of his questions from the judge who reviewed his filings, preservation of written records, surveillance videos, and other "evidence" of his interaction with the court staff, and for his filings to be deemed timely. (*Id.*) There is no mention of his disability or how his requests relate to an accommodation for his disability. (*Id.*) Regardless, it is not reasonable to impose on the First Judicial District, or any court employee for that matter, the "undue burden" to entertain the requests he made demanding that the judges answer his questions about his experience at the Clerk's Office and preserve records, surveillance videos, and internal logs of his interactions while at the office. As already stated, public entities—such as state and federal courts—are not required to "make 'fundamental' or 'substantial' alterations" in their programs or services "to accommodate a disabled individual." *Doe 1,* 585 F. Supp. 3d at 695 (citing *Alexander*, 469 U.S. at 300). Moreover, if the accommodation creates an undue burden on the courts, it is not reasonable. *See id*. at 694-95. Hurst's requests are not only completely unrelated to any accommodation for a disability, but unduly burdensome and require substantial and fundamental alterations to state court procedures. Thus, Hurst's accommodation requests were not reasonable accommodations under the ADA. *See Long v. Howard Univ*., 439 F. Supp. 2d 68, 75 (D.D.C. 2006) (holding a disabled individual is not entitled under the ADA "to whatever modification he thinks might accommodate his limitations. Nor is he entitled to obtain an advantage over his non-disabled peers. Rather, the ADA mandates that places of public accommodation make only

those reasonable modifications that are *necessary* to give a disabled individual the same opportunity to obtain the offered benefit that he would have had were it not for the limitations caused by his disability—and, even then, only to the extent that the necessary modifications would not fundamentally alter the nature of that benefit." (citing 42 U.S.C. § 12182(b)(2)(A)(ii))).

Furthermore, Hurst's allegations also do not support an inference that he was excluded or denied the ability to participate in or benefit from the public service of the court's programs, services and activities, including in judicial proceedings or denied access to the Pennsylvania courts. Notably, he does not allege any facts illustrating that he was prevented from participating in such programs *because of his* disabilities. In other words, his allegations that he was denied meaningful access to the courts are entirely conclusory. Moreover, his Complaint and the public record clearly demonstrate that he has actively participated in the underlying state court case since it was filed in May 2024. He has consistently filed motions, including having the opportunity to appeal rulings he does not agree with, and the ultimate eviction did not occur until over two years after the state case was initiated. The Court notes the initial lockout from the property was scheduled in 2024, which he avoided with the September 2024 judgment by agreement to restore possession, and the Court granted his request for possession after the subsequent lockout in August 2025, further showing his access to the courts to take part in his case and present his defense. His active involvement in these cases suggests he had meaningful access to the Pennsylvania state courts, undermining his conclusory allegations that he was denied access to or participation in his court case. *See, e.g., Bedford v. Michigan*, 722 F. App'x 515, 520 (6th Cir. 2018) (affirming dismissal of ADA Title II claim involving state court access where the plaintiff participated in the proceedings, filed motions, and attended hearings);

*McCauley v. Georgia*, 466 F. App'x 832, 837 (11th Cir. 2012) (*per curiam*) (affirming dismissal of ADA Title II claim where the plaintiff "was able to access the court and have her case heard on the merits" after filing motions that were ultimately denied); *Daniels v. Santarelli.* No. 26-7155, 2026 WL 3093675, at *6 (E.D. Pa. Oct. 16, 2026) (holding that plaintiff's active involvement in her cases suggests she had meaningful access to the Pennsylvania state courts and dismissing Title II ADA claims). The fact that Hurst may not be satisfied with the outcome of his case, how hearings were conducted, or the fundamental procedures of how courts operate does not equate to an ADA claim without allegations that he was excluded from a service provided by the First Judicial District and "that such an exclusion was by reason of his disability." *Geness v. Admin. Off. of Pennsylvania Cts.,* 974 F.3d 263, 278 (3d Cir. 2020) (internal quotations and citations omitted); *see also Kennedy v. N.J. Ct. Sys.*, No. 24-2826, 2026 WL 323878, at *3 (3d Cir. Feb. 6, 2026) (*per curiam*) (affirming dismissal of Title II claim as conclusory where plaintiff alleged she was denied access to the courts because courts "made it too difficult to access" and plaintiff failed to allege that she was "denied assistance *on the basis [of] her* disability" (emphasis added)).

In sum, Hurst has not plausibly alleged in his Complaint that he was discriminated against or denied access to the courts based on his disability. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) ("[A] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts."); *see also McDonald-Witherspoon v. City of Philadelphia*, No. 17-1914, 2017 WL 3675408, at *9 (E.D. Pa. Aug. 25, 2017) (dismissing ADA Title II claim because complaint did not contain any facts showing that plaintiff was discriminated against because of his disability).

**E. Fair Housing Act Claims**

Turning to Hurst's FHA claims, he alleges Browne, LYL, and the Fat Tail Defendants interfered, coerced, and intimidated him in violation of § 3617. (Compl. at 28.) The FHA prohibits discrimination on the basis of race, color, religion, sex, familial status, or national origin, in a variety of real estate-related transactions. *See* 42 U.S.C. § 3604. Additionally, "[i]n 1988, Congress extended the Fair Housing Act to protect against discrimination on the basis of disability." *Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96, 104 (3d Cir. 2017) (citing *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 728 n.1 (1995); Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619 (1988)). Those amendments, the FHAA, make it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of that person." 42 U.S.C. § 3604(f)(2)(A). "Under the FHAA, handicap means a physical or mental impairment which substantially limits one or more of a person's major life activities." *431 E. Palisade Ave. Real Estate, LLC v. City of Englewood*, 977 F.3d 277, 284 (3d Cir. 2020) (quoting 42 U.S.C. § 3602(h)(1)) (citation modified).

The FHAA also makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed . . . any right granted or protected by section . . . 3604 . . . of this title." 42 U.S.C. § 3617. "A Section 3617 interference claim requires proof of three elements: (1) that the plaintiff exercised or enjoyed any right granted or protected by [the FHA]; (2) that the defendant's conduct constituted interference; and (3) a causal connection existed between the exercise or enjoyment of the right and the defendant's conduct." *Revock*, 853 F.3d at 112-13 (internal quotations and footnote omitted). Interference under § 3617 may consist of harassment, provided that it is "sufficiently severe or pervasive" as to create a hostile environment." *Id.* at 113. The regulations associated

with § 3617 make clear that the section prohibits acts directed at individuals "because of" their membership in a protected class. 24 C.F.R. § 100.400(c)(2) (listing prohibited conduct to include "[t]hreatening, intimidating or interfering with persons in their enjoyment of a dwelling *because of* the race, color, religion, sex, handicap, familial status, or national origin of such persons" (emphasis added)). A claim under § 3617 does not depend upon a substantive violation of the FHA. *Revock*, 853 F.3d at 112.

Hurst has not stated a plausible FHA claim under a theory of interference. Based on his own allegations, the underlying matter is "a nonpayment matter" and ultimately led to his eviction from the property. (Compl. at 10, 22.) He claims that after the lockout, Defendant Browne conveyed to him, "Amazing how you fight to live for free," imposed a storage fee for his possessions after the state court eviction order,[13] and threatened to call the police if he entered the property and remove his surveillance cameras. (*Id*. at 28.) These allegations do not state a plausible claim that Defendants interfered with the exercise of his rights *because of* his disability. Rather, his allegations of interference stem solely from his non-payment of rent and Defendants initiating a court action seeking his eviction from the property, which was successful. The Fair Housing Act does not "create some general federal cause of action governing landlord-tenant disputes." *Rosado v. Whitcraft,* No. 23-3717, 2023 WL 8720137, at *8 (E.D. Pa. Dec. 15, 2023) (quotation omitted). Although Hurst describes Defendants' conduct as interfering with his housing rights based on his disability, no facts support that conclusory allegation. Because the conduct he alleges resulted from his nonpayment of rent and there are no non-conclusory allegations that his eviction occurred because of his disability, he has not stated a claim. *See,*

[13] The Court notes based on the emails attached to his pleadings, prior to imposing the storage fee, it appears Browne gave him an opportunity to retrieve his possessions from the property over a ten-day period. (ECF No. 3 at 29-31.)

*e.g., Daniels v. Montgomery Co. Hous. Auth.*, No. 26-2803, 2026 WL 2584712, at *7 (E.D. Pa. Sept. 1, 2026) (dismissing FHA interference claims because plaintiff's allegations against her landlord are premised on disagreements about rent payments and lease violations, not based on interference with her rights because of her disability); *Davis v. Rubin*, No. 20-6271, 2020 WL 7624833, at *3 (E.D. Pa. Dec. 22, 2020) (dismissing FHA interference and retaliation claims on screening where plaintiff neither linked alleged harassment to her exercise or enjoyment of a right under the FHA nor alleged a protected activity involving complaints about discrimination); *Jones v. 1260 Hous. Dev. Corp.*, No. 18-1420, 2018 WL 1757605, at *3 (E.D. Pa. Apr. 11, 2018) (dismissing FHA claim as conclusory because "while Mr. Jones mentions that he is African-American, nothing in the Complaint suggests that the 1206 Housing Development Corporation evicted him based upon his race"). The FHA claim will be dismissed and no leave to amend will be given since amendment would be futile. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108, 110 (3d Cir. 2002).

**F. Private Actors and Section 1983 Conspiracy Claims**

Hurst brings a claim for "joint action under the color of state law" against Browne's attorney, Baritz and his law firm, LYL, and the Fat Tail Defendants based on their involvement in the state proceedings that led to law enforcement executing the lockouts. (Compl. at 24-25.) As an initial matter, the claims against Attorney Baritz and his law firm are not plausible because an attorney performing the traditional functions of counsel – whether privately retained, court-appointed, or a public defender – is not a state actor for purposes of § 1983. *See, e.g., Gannaway v. Stroumbakis*, 842 F. App'x 725, 730 (3d Cir. 2021) (*per curiam*) (noting that "[a] privately retained attorney clearly does not act under color of state law, and . . . that 'no color of state law attache[s] to the functions of court-appointed counsel.'"); *Coulter v. Allegheny Cnty. Bar Ass'n*, 496 F. App'x 167, 169 (3d Cir. 2012) (*per curiam*) (none of the defendants named, including an

attorney, his law firm, the Pennsylvania Bar Association, the Allegheny County Bar Association or its three individual members, were state actors for purposes of Section 1983). Thus, the claims against Attorney Baritz and Baritz KBK Law Group, LLC, will be dismissed.

Hurst's constitutional claims against the remaining private entities are not plausible because they also are not state actors for purposes of § 1983. *See Groman v. Township of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995) (explaining that state action is a "threshold issue" for § 1983 claims). Whether a defendant is acting under color of state law – *i.e.*, whether the defendant is a state actor – depends on whether there is "such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Leshko v. Servis*, 423 F.3d 337, 339 (3d Cir. 2005) (internal quotations omitted). In assessing whether a private party's action constitutes state action, the Court will consider: "(1) whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state; (2) whether the private party has acted with the help of or in concert with state officials; and (3) whether the state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity." *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (internal quotations and alteration omitted). To support a finding of state action, "the government must be 'responsible for the specific conduct of which the plaintiff complains.'" *Borrell v. Bloomsburg Univ.*, 870 F.3d 154, 160 (3d Cir. 2017) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)).

None of those criteria is met here. Further, Hurst contends that these Defendants "invoked the machinery of the state" resulting in the lockouts and evictions (Compl. at 25), but private entities do not become "state actors" because they, as alleged here, used the courts to bring a civil action. *See, e.g., Dennis v. Sparks*, 449 U.S. 24, 28 (1980) ("[M]erely resorting to the

courts and being on the winning side of a lawsuit does not make a party a co-conspirator or a joint actor with the judge."); *Grapentine v. Pawtucket Credit Union*, 755 F.3d 29, 31 (1st Cir. 2014) ("Significantly, [Section] 1983 does not apply to merely private conduct, no matter how discriminatory or wrongful.") (quoting *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999)) (internal quotations omitted); *Gueson v. Feldman*, No. 00-1117, 2001 WL 34355662, at *10 (E.D. Pa. Nov. 30, 2001) ("Filing a lawsuit in state court, is not for 1983 purposes 'state action;' nor does it turn a private citizen into a state actor."). To the extent they were involved with the state actors through the eviction process and/or gave police officers information — even false information that ultimately led to the successful eviction — such conduct does not transform them into state actors. "Merely giving information to police officers is insufficient to convert a private party into a state actor." *Simmer v. Kehler*, No. 15-2285, 2015 WL 6737017, at *3 (D.N.J. Nov. 2, 2015) (collecting cases); *see also*, *e.g.*, *Yoast v. Pottstown Borough*, 437 F. Supp. 3d 403, 420 (E.D. Pa. 2020) ("Providing false information to the police — even deliberately — does not transform a private party into a state actor."), *aff'd,* No. 22-1960, 2023 WL 4418213 (3d Cir. July 10, 2023). In sum, his allegations are insufficient as a basis for finding that the private defendants may be considered state actors for purposes of § 1983. *See generally Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.") (internal quotations omitted); *see also Twombly*, 550 U.S. at 570 ("Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."). For these reasons, the § 1983 claims against the private parties are dismissed with prejudice.

**G. Municipal Liability**

Hurst names the City as a defendant. As an initial matter, a municipality is not vicariously liable under § 1983 for the actions of its employees. *See Connick v. Thompson*, 563 U.S. 51, 60 (2011) (holding that local governments can be liable as "persons" under § 1983, but this liability extends only to "their *own* illegal acts") (emphasis in original) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)). Rather, to plead a § 1983 claim against a municipality or municipal entity, a plaintiff must allege that the municipality or municipal entity's policy or custom caused the violation of his constitutional rights. *See Monell,* 436 U.S. at 694. "To satisfy the pleading standard, [the plaintiff] must . . . specify what exactly that custom or policy was." *McTernan v. City of York, PA*, 564 F.3d 636, 658 (3d Cir. 2009) (citing *Phillips v. County of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008)). A plaintiff may also state a basis for municipal liability by "alleging failure-to-supervise, train, or discipline . . . [and alleging facts showing] that said failure amounts to deliberate indifference to the constitutional rights of those affected." *Forrest v. Parry*, 930 F.3d 93, 106 (3d Cir. 2019). "This consists of a showing as to whether (1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Id.* But "[i]t is well-settled that, if there is no violation in the first place, there can be no derivative municipal claim." *Mulholland v. Gov't Cnty. of Berks, Pa.*, 706 F.3d 227, 238 n.15 (3d Cir. 2013) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (stating that if a municipal employee "inflicted no constitutional injury . . ., it is inconceivable that [the municipality] could be liable")). Because Hurst has failed to plead any plausible underlying constitutional violation, it is inconceivable that the claim against the City is plausible, and thus it will be dismissed.

### H. The FDCPA Claims against Baritz and Baritz KBK Law Group, LLC

The FDCPA "provides a remedy for consumers who have been subjected to abusive, deceptive or unfair debt collection practices by debt collectors." *Piper v. Portnoff Law Assocs., Ltd.*, 396 F.3d 227, 232 (3d Cir. 2005) (citing *Pollice v. Nat'l Tax Funding, L.P.,* 225 F.3d 379, 400 (3d Cir. 2000)). "Congress enacted the FDCPA 'to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses.'" *Rotkiske v. Klemm*, 589 U.S. 8, 10 (2019) (quoting 15 U.S.C. § 1692(e)). "The FDCPA pursues these stated purposes by imposing affirmative requirements on debt collectors and prohibiting a range of debt-collection practices." *Id.* (citing 15 U.S.C. §§ 1692b-1692j); *see also Riccio v. Sentry Credit, Inc.*, 954 F.3d 582, 585 (3d Cir. 2020) (*en banc*) ("The FDCPA protects against abusive debt collection practices by imposing restrictions and obligations on third-party debt collectors.").

To state a claim under the FDCPA, a plaintiff must allege that (1) he or she "is a consumer, (2) the defendant is a debt collector, (3) the defendant's challenged practice involves an attempt to collect a 'debt' as the [FDCPA] defines it, and (4) the defendant has violated a provision of the FDCPA in attempting to collect the debt." *Moyer v. Patenaude & Felix, A.P.C.*, 991 F.3d 466, 470 (3d Cir. 2021) (quoting *Jensen v. Pressler & Pressler*, 791 F.3d 413, 417 (3d Cir. 2015)). Where a plaintiff fails to allege facts supporting each of these elements, the FDCPA claim is not plausible. *See Humphreys v. McCabe Weisberg & Conway, P.C.*, 686 F. App'x 95, 97 (3d Cir. 2017) (*per curiam*) (concluding that FDCPA claim was not pled based on "conclusory and speculative statements that cannot survive a motion to dismiss") (citing *Iqbal*, 556 U.S. at 678); *see also Goldsmith v. Absolute Resols. Invs., LLC*, No. 25-7428, 2026 WL 896000, at *6 (E.D. Pa. Mar. 31, 2026) ("Goldsmith's allegations parrot statutory language and

are insufficient on their face to support a claim.") (citing *Shareef v. Consumer Portfolio Servs. Inc.*, No. 21-4039, 2021 WL 5823011, at *3 (E.D. Pa. Dec. 7, 2021) ("Citing to the statute and repeating the language contained in the law is insufficient to state a claim without a description of what actions . . . [the debt collector] took to give rise to the claim against it.")).

In the FDCPA context, courts analyze communications from debt collectors from the perspective of the "least sophisticated debtor." *Jensen*, 791 F.3d at 418; *see also Brown v. Card Serv. Ctr.*, 464 F.3d 450, 453 (3d Cir. 2006) ("[A]ny lender-debtor communications potentially giving rise to claims under the FDCPA . . . should be analyzed from the perspective of the least sophisticated debtor."). "This standard is less demanding than one that inquires whether a particular debt collection communication would mislead or deceive a reasonable debtor." *Campuzano-Burgos v. Midland Credit Mgmt., Inc.*, 550 F.3d 294, 298 (3d Cir. 2008) (citing *Brown*, 464 F.3d at 455). However, "although this standard protects naive consumers, it also prevents liability for bizarre or idiosyncratic interpretations of collection notices by preserving a quotient of reasonableness and presuming a basic level of understanding and willingness to read with care." *Smith v. Select Portfolio Servicing Inc.*, No. 18-2525, 2018 WL 3077795, at *1 (E.D. Pa. June 21, 2018) (quoting *Wilson v. Quadramed Corp.*, 225 F.3d 350, 354-55 (3d Cir. 2000) (internal quotation marks omitted)).

Throughout his Complaint, Hurst points to the organizational structure of the Fat Tail Defendants—Fat Tail Real Property III, LP, Fat Tail Holdings, LLC, and Fat Tail Holdings, III, LLC. Relevant to his FDCPA claim, Hurst claims Attorney Baritz and his law firm did not identify the correct creditor on their Notice to Vacate, correspondence, and other communications regarding his nonpayment of rent, which reflected the creditor as "Fat Tail Real Property III." (Compl. at 29-31.) Because his lease identifies the property's landlord, and to

whom rent is payable, as "Fat Tail Holdings," he avers this informational defect violates Section 1692g(a),[14] which requires that the written notice must state the name of the creditor to whom the debt is owed. (Compl. at 30.) He claims this representation also violates Section 1692e, which prohibits the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e.

As an initial matter, it does not appear Hurst has standing to bring this claim. To establish an injury in fact, a plaintiff must show, that he has "suffered . . . an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560 n.1). "To constitute an informational injury, there must be an outright omission of information; unclear or ineffective disclosures do not create an injury." *McDonough v. Leopold & Assocs., PLLC*, No. 21-0375, 2024 WL 3430504, at *6 (W.D. Pa. July 16, 2024) (citation omitted). Hurst alleges he "suffered damages" (Compl. at 31), but it is unclear how this minor discrepancy resulted in any "concrete" injury. *See Facchini v. Resurgent Cap. Servs., L.P.*, No. 22-1621, 2023 WL 4236032, at *4 (D. Conn. June 28, 2023) (finding that plaintiff lacked standing where she failed to allege facts to suggest how or why the discrepancy in dates in the validation letter made her "unable" to

[14] Without any supporting allegations, Hurst also makes a passing reference to violations of Section 1692d, providing that a debt collector may not "harass, oppress, or abuse" any person in connection with the collection of a debt, and Section 1692f, prohibiting a debt collector from using "unfair or unconscionable means" to collect, or attempt to collect, a debt. (Compl. at 30.) A "'passing reference' to jurisprudential precepts without more does not bring that issue before the Court in that it provides no basis for a ruling one way or the other." *Campbell v. LVNV Finding, LLC*, No. 21-5388, 2022 WL 6172286, at *7 n.10 (E.D. Pa. Oct. 7, 2022) (citing *Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994)).

evaluate her options leading her to not exercise her rights to dispute the debt); *see also Valentine v. Unifund CCR, LLC*, No. 20-5024, 2023 WL 22423, at *3 (D.N.J. Jan. 3, 2023) ("[M]erely receiving a 'misleading' collection letter, as alleged here, is insufficient to establish a concrete injury, absent some action or inaction taken in response or other form of injury.").

Even assuming *arguendo* he adequately alleged standing for purposes of this Memorandum, Hurst's claims nonetheless cannot proceed. His allegations fail to allege the creditor being identified as "Fat Tail Real Property III" instead of "Fat Tail Holdings III" is false and misleading under Section 1692e. To state a claim under § 1692e, as mentioned, a false statement "must be material when viewed through the least sophisticated debtor's eyes." *Jensen*, 791 F.3d at 421; *see also Huber v. Simon's Agency, Inc.*, 84 F.4th 132, 150 (3d Cir. 2023) (stating that a court must consider "whether a debt collector's statement in a communication to a debtor would deceive or mislead the least sophisticated debtor.") (citation omitted). "Because the standard is objective, 'the specific plaintiff need not prove that []he was actually confused or misled, only that the objective least sophisticated debtor would be.'" *Huber*, 84 F.4th at 150 (quoting *Jensen*, 791 F.3d at 419). Hurst does not actually assert any confusion arising from whom the debt was owed to based on the creditor's name on the Notice to Vacate nor do the allegations support that the objectively least sophisticated debtor would be misled. To the contrary, the allegations make clear the debt was due to be paid to Hurst's landlord and regardless of which "Fat Tail Defendant" was owed the debt, it is obvious the payments were due for the nonpayment of rent at the property. Hurst asserts extensive knowledge of the structure of Fat Tail Defendants and alleges the entities are associated with the property's owner, Browne. (Compl. at 3.) He acknowledged he signed a lease at the property under "Fat Tail Holdings" (*id.* at 5), and the copy of his lease attached to his pleadings identifies "Fat Tail

Holdings III" as the landlord. (ECF No. 9 at 128.) He further acknowledges this is a case about a non-payment of rent at the property. (Compl. at 5-6.) Regardless of whether the Notice to Vacate identified the creditor as "Fat Tail Holdings III," "Fat Tail Holdings," or Fat Tail Real Property III," nothing from the allegations makes plausible that any confusion or harm, to even the least sophisticated debtor, would result from this minor discrepancy. Thus, the FDCPA claim against Baritz and his law firm, Baritz KBK Law Group, LLC, will be dismissed for failure to state a claim.[15]

**I. State Law Claims**

Because Hurst's federal claims will be dismissed, the Court will not exercise supplemental jurisdiction under 28 U.S.C. § 1367(c) over his remaining claims brought under state law. Accordingly, the only independent basis for jurisdiction over any such claims is 28 U.S.C. § 1332(a), which grants a district court jurisdiction over a case in which "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States." Section 1332(a) requires "'complete diversity between all plaintiffs and all defendants,' even though only minimal diversity is constitutionally required. This means that, unless there is some other basis for jurisdiction, 'no plaintiff [may] be a citizen of the same state as any defendant.'" *Lincoln Benefit Life Co.,* 800 F.3d at 104 (quoting *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 89 (2005) and *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 419 (3d Cir. 2010) (internal footnotes omitted)). As stated, the plaintiff has the burden of

[15] Although it is unclear when the Notice to Vacate was issued, there also may be a statute of limitations issue based on Hurst's reference to overcoming the limitations period. (Compl. at 30.) Under the FDCPA, an action must be brought "within one year from the date on which the violation occurs." 15 U.S.C. § 1692k(d). To the extent the Notice to Vacate was issued prior to September 2, 2025, one year before the Complaint was filed, it appears this claim would be barred by the statute of limitations.

pleading the existence of the court's jurisdiction, *see* Fed. R. Civ. P. 8, and "'in a diversity action, the plaintiff must state all parties' citizenships such that the existence of complete diversity can be confirmed.'" *Craven v. Leach*, 647 F. App'x 72, 75 (3d Cir. 2016) (quoting *Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.,* 177 F.3d 210, 222 n. 13 (3d Cir. 1999)).

An individual is a citizen of the state where he is domiciled, meaning the state where he is physically present and intends to remain. *See Washington v. Hovensa LLC*, 652 F.3d 340, 344 (3d Cir. 2011). Residence alone is insufficient to establish domicile. *Krasnov v. Dinan*, 465 F.2d 1298, 1300 (3d Cir. 1972) ("The fact of residency must be coupled with a finding of intent to remain indefinitely."). Rather, "domicile is established by an objective physical presence in the state or territory coupled with a subjective intention to remain there indefinitely." *Hovensa LLC*, 652 F.3d at 344. The citizenship of a partnership or an LLC is determined by the citizenship of its partners or members. *Lincoln*, 800 F.3d at 105.

Hurst has not met his burden. Although he does not allege the state citizenship for the parties, the underlying case is premised on his intent to stay in Philadelphia at the property as a Pennsylvania domicile. He provides a Philadelphia address for Attorney Baritz (Compl. at 4), and names the City, which is a Pennsylvania citizen for jurisdictional purposes because the City "is a political subdivision of the Commonwealth of Pennsylvania." *See Gibson v. City of Philadelphia*, No. 25-427, 2025 WL 1139266, at *8 (E.D. Pa. Apr. 16, 2025) (citing *Doolin v. Kasin*, 424 F. App'x 106, 109 (3d Cir. 2011)). Because it appears Hurst and at least some of the Defendants are citizens of Pennsylvania, diversity jurisdiction does not exist over any state law claims. Accordingly, all state law claims will be dismissed for lack of subject matter jurisdiction. The dismissal will be without prejudice, and Hurst may file his state law claims in

the appropriate state court if he chooses to do so, where federal jurisdiction will not be an issue.[16] *See Associated Builders & Contractors W. Pa. v. Cmty. Coll. of Allegheny Cnty.*, 81 F.4th 279, 291 (3d Cir. 2023) ("[A] dismissal for lack of subject matter jurisdiction is not an adjudication on the merits and thus should be ordered 'without prejudice.'" (quoting *Figueroa v. Buccaneer Hotel Inc.*, 188 F.3d 172, 182 (3d Cir. 1999))); *see also N.J. Physicians, Inc. v. President of U.S.*, 653 F.3d 234, 241 n.8 (3d Cir. 2011) (explaining that dismissals for lack of subject matter jurisdiction are "by definition without prejudice" (citation omitted)).

## IV. CONCLUSION

For the foregoing reasons, the Court will dismiss Hurst's Complaint. All federal claims will be dismissed with prejudice and no leave to amend will be given as amendment of those claims would be futile. *See Grayson,* 293 F.3d at 108, 110. Any state law claims and all claims barred by the *Rooker-Feldman* doctrine will be dismissed without prejudice for lack of subject matter jurisdiction.

An appropriate Order dismissing this case will be entered separately. *See* Federal Rule of Civil Procedure 58(a).

**BY THE COURT:**



**JOHN F. MURPHY, J.**

[16] The Court expresses no opinion on the merits of Hurst's state law claims.